AO 91 (Rev. 11/11) Criminal Complaint                                      AUSA Elie Zenner (312) 697-4032

**FILED**
2/20/2026
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

TARRELL SMITH,
      also known as "Patone;"
DESHAWN POWELL,
      also known as "30;"
JOSHUA THOMAS; and
BERNARD SPENCER

CASE NUMBER: **26CR69**
**UNDER SEAL**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Beginning no later than on or about November 25, 2025, and continuing through on or about February 19, 2026, at Chicago, in the Northern District of Illinois, Eastern Division, the defendants violated:

| *Code Section* | *Offense Description* |
|---|---|
| Title 21, United States Code, Section 841 and 846 | did conspire with each other, and with others known and unknown, to knowingly and intentionally possess with intent to distribute, and distribute a controlled substance, namely 40 grams or more of a mixture and substance containing a detectable amount of fentanyl, a Schedule I Controlled Substance; and quantity of a mixture and substance containing a detectable amount of cocaine, a Schedule I Controlled Substance; in violation of 21 U.S.C. § 841(a)(1), all in violation of 21 U.S.C. § 846. |

This criminal complaint is based upon these facts:

  X  Continued on the attached sheet.

*Tyler Evans*

TYLER EVANS
Special Agent, Bureau of Alcohol, Tobacco, Firearms & Explosives

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: February 20, 2026

*Laura K. McNally*
box SIGN *Judge's signature*

City and state: Chicago, Illinois

LAURA K. MCNALLY, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## **AFFIDAVIT**

I, TYLER EVANS, being duly sworn, state as follows:

## I. INTRODUCTION

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives. I have been so employed since approximately 2021. As part of my duties as an ATF Special Agent, I investigate criminal violations relating to violent crimes and firearms, including, among others, violations of the Gun Control Act of 1968, National Firearms Act of 1934, and other federal firearms statutes relating to the unlawful use, possession, and trafficking of firearms. I also investigate controlled substances offenses. My duties also include the investigation of drug trafficking organizations, violations of federal narcotics laws, and violations of federal firearm laws, including offenses defined by 21 U.S.C. §§ 841, 843 and 846. I have received training in the area of gang investigations, drug investigations, firearm investigations, and narcotics investigations.

2. This affidavit is submitted in support of a criminal complaint alleging that beginning no later than on or about November 25, 2025 and continuing until on or about February 19, 2026, at Chicago, in the Northern District of Illinois, TARRELL SMITH, (also known as "Patone"), DESHAWN POWEL (also known as "30"), BERNARD SPENCER, and JOSHUA THOMAS did conspire with each other, and with others known and unknown, to knowingly possess with intent to distribute, and

distribute, a controlled substance, namely 40 grams or more of a mixture and substance containing a detectable amount of fentanyl, a Schedule I Controlled Substance, and a quantity of a mixture and substance containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 841(a)(1) and 846.

3.     Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging POWELL, SMITH, SPENCER, and THOMAS with conspiracy to possess with intent to distribute and distribute controlled substances, I have not included each and every fact known to me concerning this investigation. Instead, I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendants committed the offense alleged in the complaint.

4.     The statements contained in this Affidavit are based on my personal participation in this investigation; telephone records, including subscriber information, toll records, pen registers, and phone location monitoring; surveillance reports and video surveillance footage; criminal history and arrest records; information provided from a confidential informant; undercover audio and video recordings; information provided by other law enforcement officers, including officers with the Chicago Police Department; my training and experience; and the training and experience of other law enforcement agents with whom I have consulted.

## II.     FACTS SUPPORTING PROBABLE CAUSE

5.     Based on information from confidential sources and undercover agents, search warrants, physical and video surveillance, controlled purchases and seizures

of narcotics, there is probable cause to believe that SMITH and POWELL run a drug trafficking organization (the "DTO"), and that SPENCER, THOMAS, and others, have conspired with SMITH and POWELL to obtain wholesale quantities of fentanyl and cocaine for distribution to customers primarily from an apartment located at 919 E. 82nd Street, Apartment 3, in Chicago ("**Subject Apartment 1**"). Customers arrange to purchase narcotics at **Subject Apartment 1** by calling phone number 773-263-4790 ("**Subject Phone 1**"). As part of the DTO's operation, the conspirators stored narcotics at 7955 S. Ellis Avenue, Apartment 1, in Chicago ("**Subject Apartment 2**"). Since in or around November 2025, law enforcement has observed, and video surveillance footage has captured, SMITH and POWELL traveling to and from **Subject Apartment 1** and **Subject Apartment 2**, often with backpacks or bags, and on at least one occasion with baggies consistent with those used to package narcotics. Video surveillance footage also captured SMITH entering **Subject Apartment 2** in possession of a firearm.

6.      As discussed in more detail below, on or about January 13, 2026, SPENCER sold suspect cocaine and fentanyl to an undercover law enforcement officer at **Subject Apartment 1**. On or about January 22, 2026, THOMAS sold suspect cocaine and fentanyl to an undercover officer at **Subject Apartment 1**. On or about February 11, 2026, THOMAS sold suspect cocaine and fentanyl to two undercover officers at **Subject Apartment 1** with SPENCER nearby. On February 19, 2026, law enforcement arrested SPENCER and THOMAS inside **Subject Apartment 1**. They were the only two individuals present at the apartment.

7.    Moreover, as discussed in more detail below, on February 19, 2026, law enforcement also executed a warrant to search **Subject Apartment 2**. When law enforcement entered **Subject Apartment 2**, SMITH and POWELL were the only two individuals present. Inside **Subject Apartment 2**, law enforcement recovered, among other things, crack cocaine packaged for distribution; distribution amounts of heroin, fentanyl, and cocaine; scales consistent with those used to weigh and package drugs; three firearms; and in excess of approximately $3,000 in cash. Law enforcement also recovered in excess of approximately $5,000 in cash from POWELL's person.

**A.    Search of Subject Apartment 2**

8.    On February 18, 2026, Magistrate Judge Laura K. McNally issued a warrant authorizing law enforcement to search **Subject Apartment 2** (26 M 97). Law enforcement executed the search warrant on February 19, 2026.

9.    Based on my personal observations, information provided by law enforcement agents involved in the search, and my review of the physical evidence and video surveillance footage, SMITH and POWELL were the only two individuals present inside **Subject Apartment 2** when the search warrant was executed. Both SMITH and POWELL fled out of the rear of the apartment when law enforcement approached. SMITH and POWELL were both arrested in a rear stairwell. POWELL had approximately $5,096 in cash in his possession at the time of his arrest. A cell phone was recovered from the rear stairwell near where POWELL was arrested. Law enforcement agents also recovered two cell phones from SMITH at the time of his

arrest. As described in more detail below, when agents called the phone number associated with **Subject Phone 1**, which was used to arrange drug transactions, one of the phones recovered from SMITH rang.

10.     Based on my personal observations, information provided by law enforcement agents involved in the search, my training and experience, inside **Subject Apartment 2**, law enforcement agents recovered, among other items, distribution amounts of suspect heroin, fentanyl, and cocaine, scales, and packaging materials consistent with those used to package and prepare narcotics, and three firearms. More specifically:

a.     Inside one bedroom, law enforcement identified multiple items of clothing that they had previously observed, either on surveillance camera footage or in person surveillance, POWELL wearing, including a red and black leather jacket that POWELL was captured wearing on surveillance footage on February 10, 2026, among other dates, as described below. On a bedside table in that same bedroom, law enforcement recovered a loaded handgun with an extended magazine, which had an attached machinegun conversation device. In a backpack in the bedroom, law enforcement recovered loose ammunition and another handgun with a machinegun conversion device attached, as well as an unattached machinegun conversion device. Law enforcement also recovered a key to **Subject Apartment 2**, an Audi car key,[1] and a cell phone. In the bedroom closet, law enforcement recovered a large yellow bag

---

[1] I have personally observed POWELL driving an Audi SUV on multiple occasions between in or around November 2025 and February 2026.

that contained smaller bags containing distribution amounts of suspect heroin and cocaine.[2]

   b.   In another bedroom, law enforcement identified a prescription drug bottle with SMITH's name on it, as well as paperwork and bank statements in SMITH's name. In the closet of that bedroom, law enforcement recovered approximately $3,375 in cash and distribution amounts of suspect crack cocaine packaged in individual, knotted plastic baggies.[3]

   c.   In the living room, law enforcement recovered a loaded gun under the couch. On the couch, law enforcement identified a jacket that SMITH had been wearing, as observed in person and on fixed camera surveillance, before the search was executed on February 19, 2026. In a jacket pocket, law enforcement recovered a check addressed to SMITH. Law enforcement recovered a phone on the couch in the living room. On the coffee table in the living room, law enforcement recovered a scale that, based on my training and experience, is consistent with the type of scales often used to weigh and measure drugs. Inside the coffee table, law enforcement recovered several plastic baggies, additional scales, ammunition, and a letter from a property management company referencing **Subject Apartment 1**.

   d.   In the freezer located inside the kitchen, law enforcement recovered three individual bundles containing distribution amounts of suspect

---

[2] I suspect these substances were heroin and cocaine, based on my training and experience, including in this investigation, and the appearance and packaging of the substances.
[3] I suspect these substances were crack cocaine, based on my training and experience, including in this investigation, and the appearance and packaging of the substances.

fentanyl. This substance field tested positive for fentanyl. Based on my review of the bundles and my review of narcotics previously purchased in this investigation (discussed below), the bundles were consistent with the appearance of the bundles purchased by UCs at **Subject Apartment 1** on February 11, 2026. In the kitchen, law enforcement recovered a blender and coffee pot that, based on my training and experience and review of the evidence, both contained residue consistent with the appearance of crack cocaine. On the counter in the kitchen, law enforcement recovered a straight edge razor with similar residue. Under the sink in the kitchen, law enforcement recovered a measuring spoon, among other items.

### B.    Search of Subject Apartment 1

11.    On February 18, 2026, Magistrate Judge Laura K. McNally issued a warrant authorizing law enforcement to search **Subject Apartment 1** (26 M 96). Law enforcement executed the search warrant on February 19, 2026. Based on the observations of other law enforcement agents, SPENCER and THOMAS were the only individuals present in **Subject Apartment 1**. Both SPENCER and THOMAS were arrested inside **Subject Apartment 1**.

12.    Based on my personal observations, information provided by law enforcement agents involved in the search, my training and experience, inside **Subject Apartment 1** law enforcement recovered at least one "business card" containing the phone number for **Subject Phone 1**. Below is a photograph of the business card featuring the phone number for **Subject Phone 1**:



Law enforcement also recovered mail addressed to POWELL.

13. As discussed below, law enforcement conducted a series of controlled narcotics transactions in which THOMAS and/or SPENCER distributed narcotics at **Subject Apartment 1** between on or about November 25, 2025, and on or about February 11, 2026, all of which were arranged using **Subject Phone 1**.

### C. Subject Phone 1

14. As discussed above, law enforcement recovered **Subject Phone 1** from SMITH in connection with the search of **Subject Apartment 2** on February 19, 2026. As discussed in more detail below, according to cellular tower records and in person surveillance, on February 9, 2026, **Subject Phone 1** was using cellular towers consistent with the movement of SMITH.

15. Based on records and information obtained from AT&T and other providers, **Subject Phone 1** had at least approximately 65 contacts with **Subject Phone 2** between on or about March 11, 2025, and on or about October 6, 2025, and approximately seven contacts with **Subject Phone 2** between on or about December 31, 2025, and on or about January 25, 2026. Based on records and information

8

obtained from T-Mobile, **Subject Phone 2** is subscribed to TARELL SMITH and has been active and subscribed to SMITH since about January 2025. Based on these call records, the evidence indicates that SMITH was in regular communication with **Subject Phone 1**, the phone used to arrange drug transactions at **Subject Apartment 1**, as described below.

16.     Based on records and information obtained from AT&T and other providers, **Subject Phone 1** had approximately 129 contacts with **Subject Phone 4** between on or about November 1, 2025, and on or about January 31, 2025. Based on records and information obtained from T-Mobile, the subscriber for **Subject Phone 4** did not provide a name. Based on records and information obtained Apple, the iCloud account associated with **Subject Phone 4** lists the current subscriber as "John Doe"; however, the previous subscriber, in January 2023, was listed as "Deshawn Powell." Additionally, recent iCloud financial transactions from between in or around June 2025 and in or around September 2025 listed "Deshawn Powell" as the user of the iCloud account associated with **Subject Phone 4**. Moreover, one of the email addresses associated with iCloud account associated with **Subject Phone 4** is deshawnpowell3030@gmail.com. Further, based on records and information obtained from Google, **Subject Phone 4** is also associated with the deshawnpowell3030@gmail.com email address. Accordingly, there is probable cause to believe that **Subject Phone 4** is associated with POWELL. Further, based on these call records, the evidence indicates that POWELL was in regular

9

communication with **Subject Phone 1**, the phone used to arrange drug transactions at **Subject Apartment 1**, as described below.

17. Based on records and information obtained from T-Mobile, **Subject Phone 2** and **Subject Phone 4** had approximately 402 contacts between on or about January and on or about October 2025, and approximately 13 contacts between on or about December 31, 2025, and on or about January 28, 2026. Based on these call records, the evidence indicates that SMITH and POWELL were in regular communication with each other, including during the months that drugs were distributed out of **Subject Apartment 1**, as described below.

### D. Controlled Narcotics Transactions at Subject Apartment 1

18. As discussed below, law enforcement conducted a series of controlled narcotics transactions at **Subject Apartment 1** between on or about November 25, 2025, and on or about February 11, 2026, all of which were arranged using **Subject Phone 1**.

#### 1. November 25, 2025 Narcotics Transaction

19. Based on records and information provided by Chicago Police Department, on or about November 25, 2025, a confidential informant ("CI")[4] working with the Chicago Police Department purchased heroin at 917-919 E. 82nd Street in Chicago. More specifically, according to information provided by the CI to CPD, the

---

[4] The CI has been a registered and paid informant with the Chicago Police Department for approximately three years. During that time, the informant has made multiple positive controlled narcotics purchases and gathered intelligence that has later been corroborated by investigation. The CI's controlled purchases have resulted in multiple narcotics arrests and charges. The CI has prior convictions for attempted burglary, burglary, trespass to property, and possession of a controlled substance.

CI encountered another drug purchaser in the area; they walked together to 917-919 E. 82nd Street. The drug purchaser told the CI that to purchase drugs from this location, a customer had to contact a phone number. The individual related that they had already contacted the number. The CI and the other individual arrived at the rear of 917-919 E. 82nd Street. An unknown person came to the door at the rear of the building and sold four small bags of suspect heroin to the CI.[5] As they were leaving, the unknown person provided the CI with a business card that listed **Subject Phone 1**. The unknown person explained that a customer had to contact this number in order to purchase narcotics from this location. The business card provided to the CI appears the same as the card recovered in **Subject Apartment 1** during the search on February 19, 2026.

### 2. December 2, 2025 Narcotics Transaction

20. Based on records and information provided by Chicago Police Department, on or about December 2, 2025, the CI again purchased suspect heroin at 917-919 E. 82nd Street. The CI contacted **Subject Phone 1** to arrange the transaction. When the CI arrived at 917-919 E. 82nd Street, the CI entered the apartment building and went to an apartment in 917-919 E. 82nd Street and purchased four bags of suspect heroin from an unknown person for approximately $10 per bag.[6]

---

[5] I suspect this substance was heroin based my review of pictures of the substance, my training and experience, and my knowledge about controlled substances and their distribution.

[6] I suspect this substance was heroin based my review of pictures of the substance, my training and experience, and my knowledge about controlled substances and their distribution.

### 3. January 13, 2026 Narcotics Transaction

21. Based on records and information provided by Chicago Police Department and an audio and video recording, on or about January 13, 2026, an undercover CPD officer and the CI conducted a controlled purchase of narcotics at **Subject Apartment 1**. The UC called **Subject Phone 1** to arrange the transaction. That call was recorded. A male voice answered, and the UC stated that the UC was going to "come through." The male voice said, "okay." The UC wore a concealed audio and video recording device in connection with the transaction. Based on my review of the recording, the UC and the CI used the rear external stairwell to walk up to **Subject Apartment 1** and meet with a person at the back door, who was a heavyset male with only one arm. As described below, law enforcement has identified this man as BERNARD SPENCER.

22. The UC requested heroin and crack cocaine, and the CI requested heroin. The UC observed SPENCER obtain suspect narcotics from a freezer in the kitchen area, which SPENCER then handed to the UC and the CI. The CI and the UC gave SPENCER $100 in total. SPENCER relayed to the UC that drugs were available at **Subject Apartment 1** 24 hours a day so long as the UC called first. The narcotics provided to the UC field tested positive for cocaine and fentanyl.

23. Based on the UC's review of SPENCER's booking photograph, the UC identified SPENCER as the individual who sold the narcotics to the UC. Moreover, based on my review of the UC's recording and SPENCER's booking photograph, SPENCER is the person who sold the narcotics to the UC.

12

### 4. January 22, 2026 Narcotics Transaction

24. Based on records and information provided by Chicago Police Department and audio and video recordings, on or about January 22, 2026, two undercover officers conducted a controlled purchase of narcotics at **Subject Apartment 1**. Prior to the transaction, one of the UCs called **Subject Phone 1** and requested to purchase drugs. This call was recorded. A male voice answered, and the UC stated that the UC was going to "come through." The male voice said, "okay." One of the UCs wore concealed audio and video recording devices in connection with the transaction. Based on my review of the recordings, the UCs used the rear external stairwell to walk up to **Subject Apartment 1** and meet with a person at the back door, who, as discussed below, has been identified as THOMAS. One of the UCs requested "rock," which based on my training and experience, I know to be slang for crack cocaine. After the UC requested "rock," THOMAS gave the UC suspect crack cocaine. The other UC asked for "D," which based on my training and experience, I know to be slang for "dope" or heroin or fentanyl. THOMAS provided the UC with suspect heroin. The UCs provided THOMAS with $100 in return for the narcotics. The narcotics provided to the UCs field tested positive for cocaine and fentanyl.

25. Based on my review of the video of this transaction and my review of THOMAS's driver's license and booking photographs, THOMAS is the person who came to the door. On multiple occasions between December 2025 and January 2026, I observed (either in person or on surveillance camera footage) POWELL driving a white Audi SUV, bearing Illinois Tag EY87720 (the "Audi"). According to law

13

enforcement and commercial databases, the Audi is registered to THOMAS. Further, as discussed above, THOMAS was arrested in **Subject Apartment 1** on February 19, 2026.

### 5.      February 11, 2026 Narcotics Transaction

26.     Based on records and information provided by Chicago Police Department and audio recording, on or about February 11, 2026, two undercover officers conducted another controlled purchase of narcotics at **Subject Apartment 1**. Prior to the transaction, one of the UCs called **Subject Phone 1**. The call was recorded. A male answered the call, and the UC indicated that the UC had money. The user of **Subject Phone 1** instructed the UC to knock on the door. One of the UCs wore a concealed audio recording device in connection with the transaction. According to information provided by the UCs, based on their review of photographs of SPENCER and THOMAS, when the UCs arrived at **Subject Apartment 1**, they went to the rear door, and an individual with only one arm, whom law enforcement has identified to be SPENCER, opened the rear door for the UCs. While they were standing at the door, the UCs observed THOMAS walk from an adjoining room and place a bag of suspect crack cocaine on the table. THOMAS asked the UCs what they wanted. One of the UCs requested crack cocaine. THOMAS provided five baggies of suspect crack cocaine to the UC in exchange for $50. The other UC requested four "bundles" of heroin for $350. THOMAS walked to a nearby freezer, and removed four bundles of suspect heroin, which he provided to the UC in exchange for $350 cash.

14

27. As mentioned above, the individual who opened the door for the UCs only had one arm and was identified to be SPENCER based on the UCs' review of his booking photograph. Based on my review of records and information from the Chicago Police Department, on or about October 8, 2025, officers responded to a shots-fired call at 916 E. 82nd Street, Unit 2, in Chicago. The building is located across the street from **Subject Apartment 1**. When police arrived on scene, SPENCER was in Unit 2. SPENCER has only one arm. Officers conducted a protective sweep of the apartment and recovered multiple firearms and suspect narcotics. Based on my review of surveillance footage, on or about October 30, 2025, fixed cam surveillance captured a man matching SPENCER's appearance conducting an apparent narcotics transaction with individuals in the alley located behind 916 E. 82nd Street (screenshot below, SPENCER is shirtless).



**E.     SMITH and POWELL Moved Suspect Narcotics Between Subject Apartments 1 and 2**

28.     Law enforcement has conducted surveillance in the area of **Subject Apartment 1** over the last several months. As described in more detail below, based on in person surveillance by myself and other agents and my and other agents' review of surveillance footage from fixed pole cameras and other fixed internal cameras, over the last several months, SMITH and POWELL have repeatedly traveled to and from **Subject Apartment 1** and **Subject Apartment 2**. As shown by surveillance video footage discussed below, on multiple of those occasions, law enforcement observed SMITH or POWELL entering or exiting the **Subject Apartment 1** building with bags or backpacks.

29.     Using in person surveillance and surveillance from pole cameras and an internal surveillance camera inside a common area in the **Subject Apartment 2** building, law enforcement agents observed SMITH and POWELL regularly enter **Subject Apartment 2**. More specifically, between February 4 and February 13, 2026, on at least approximately 8 occasions, law enforcement observed on fixed camera or in person surveillance SMITH going to or coming from **Subject Apartment 2**. On at least 9 occasions in the same time period, law enforcement observed POWELL going to or coming from **Subject Apartment 2**. On multiple occasions, SMITH and POWELL have been at **Subject Apartment 2**.  at the same time. As described in more detail below, law enforcement has also observed POWELL and SMITH traveling between **Subject Apartment 1** and **Subject Apartment 2**.

16

     **1.**     **December 4, 2025: Surveillance Captures POWELL Bringing Bags from Subject Apartment 1 to Subject Apartment 2**

30.    Based on video surveillance footage, on or about December 4, 2025, two days after a controlled drug transaction at **Subject Apartment 1**, surveillance footage showed POWELL leave **Subject Apartment 1** with a bag, get into an Audi SUV, and drive to **Subject Apartment 2.** Below are screenshots of POWELL getting into the Audi SUV outside of **Subject Apartment 1** and entering the building for **Subject Apartment 2** with the same bag that he carried out of **Subject Apartment 1**:



*Powell Leaving Subject Apartment 1*

17



*Powell Arriving at Subject Apartment 2*

### 2. February 4, 2025: Surveillance Captures SMITH Bringing a Bag to Subject Apartment 1

31. Based on in person and fixed camera surveillance, on or about February 4, 2026, law enforcement observed SMITH exit the **Subject Apartment 2** building, enter a Hyundai SUV, and drive to the block of **Subject Apartment 1**. A few minutes after SMITH parked on that block, an unknown male approached the Hyundai, opened the passenger door, reached into the Hyundai, removed a black bag, and carried the black bag into the **Subject Apartment 1** building.

### 3. February 5, 2025: Surveillance Captures SMITH and POWELL at Subject Apartment 2

32. On or about February 5, 2026, shortly after POWELL was observed on the block of **Subject Apartment 1**, POWELL was captured on internal surveillance entering the **Subject Apartment 2** building with a black bag. SMITH was captured on the same internal surveillance exiting **Subject Apartment 2**. Then, in the early morning hours of February 6, 2026, POWELL was captured on surveillance leaving with no visible bag.

18

### 4. February 8, 2025: Surveillance Captures SMITH Bringing a Gun into Subject Apartment 2

33. On or about February 8, 2026, a person wearing a mask but, as discussed in more detail below, wearing clothing matching that worn by SMITH a day later, was captured on surveillance cameras outside of the **Subject Apartment 2** building carrying a black bag. Internal surveillance cameras in the entrance common area of the **Subject Apartment 2** building captured the man remove a gun with an extended magazine from his waistband and then carry the gun and the bag into **Subject Apartment 2**. Below is a screenshot of the man matching SMITH's appearance with the gun shortly before entering **Subject Apartment 2**:



19

**5. February 9, 2025: Surveillance Captures SMITH and POWELL Traveling Between Subject Apartment 1 and Subject Apartment 2 with Bags**

34. Using surveillance footage, on or about February 9, 2026, law enforcement observed POWELL driving a white Buick SUV. Law enforcement observed POWELL park the Buick on the 7900 block of S. Ellis. POWELL exited the vehicle and entered the **Subject Apartment 2** building carrying a backpack and plastic bag. About two hours later, POWELL exited the **Subject Apartment 2** building with no bags visible on surveillance footage. POWELL drove the Buick to the 900 block of E. 82nd Street, got out and entered the **Subject Apartment 1** building. A few minutes later, POWELL exited the **Subject Apartment 1** building and returned to the Buick. POWELL then drove the Buick back to the area of **Subject Apartment 2**, parked, got out of the vehicle and entered the **Subject Apartment 2** building.

35. As captured on surveillance footage, shortly after POWELL entered the **Subject Apartment 2** building, law enforcement observed SMITH, wearing a face mask partially covering his face, park a Hyundai SUV on the 7900 block of S. Ellis. A few minutes after SMITH parked, an unknown male exited the **Subject Apartment 2** building with a backpack and got into SMITH's Hyundai Kona. A few minutes later, the unknown male exited SMITH's Hyundai without the bag, reentered the **Subject Apartment 2** building, then shortly after, exited the building. Law enforcement then observed SMITH drive the Hyundai to the 900 block of E. 82nd, get out, and enter the **Subject 1 Apartment** building. A few minutes later, SMITH

20

exited the **Subject Apartment 1** building, entered the Hyundai, and drove it back to the 7900 block of S. Ellis. SMITH got out and entered the **Subject Apartment 2** building.

36.     As captured on surveillance footage, at approximately the same time SMITH entered the **Subject Apartment 2** building, POWELL exited the apartment with an unknown male. POWELL was carrying a backpack and wearing the red and black jacket that closely resembles and appears to be the same red and black jacket that, as discussed above, was recovered from **Subject Apartment 2** on February 19, 2026.

37.     As captured on surveillance footage, a few minutes later, SMITH exited the building and stood briefly with POWELL and the unknown male outside the **Subject Apartment 2** building. POWELL and SMITH then left the area separately with POWELL driving the Buick and SMITH driving the Hyundai. Law enforcement continued to surveil SMITH as he traveled to an auto pound where law enforcement observed him with his mask pulled down and confirmed that the person driving the Hyundai that day was SMITH. As reflected below, SMITH appeared to be wearing the same clothes and mask worn by the man who was captured on internal surveillance bringing the gun into **Subject Apartment 2** on February 8, 2026:

21



38. Based on a review of cell-site records provided by AT&T, on February 9, 2026, **Subject Phone 1** used cellular towers consistent with SMITH's travel between **Subject Apartment 1**, **Subject Apartment 2**, and the auto pound.

### 6. February 10, 2025: Surveillance Captures POWELL and SPENCER with Suspect Narcotics

39. On or about February 10, 2026, as captured on surveillance cameras, in the early morning hours, a man matching SMITH's appearance and wearing a mask entered **Subject Apartment 2** clutching his waistband. Later that morning, POWELL entered **Subject Apartment 2** carrying his phone and a bag. POWELL later exited **Subject Apartment 2** with a phone in his hand but no bag. As captured on surveillance cameras, POWELL then drove to the block of **Subject Apartment 1** and entered the **Subject Apartment 1** building. A few minutes later, POWELL exited the **Subject Apartment 1** building. Less than two hours later, POWELL returned to the **Subject Apartment 2** building and entered with a bag in his hand. POWELL later exited the **Subject Apartment 2** building without a visible bag.

Below is a screenshot of POWELL entering **Subject Apartment 2** with a bag and later exiting with no bag:





As captured on surveillance footage, POWELL was wearing a red and black jacket that that closely resembles and appears to be the same red and black jacket that, as discussed above, was recovered from **Subject Apartment 2** on February 19, 2026.

23

40.     Based on review of surveillance footage, shortly after exiting with no bag, POWELL returned to the **Subject Apartment 2** building and entered with a backpack. Less than an hour later, POWELL exited the **Subject Apartment 2** building without the backpack. POWELL was carrying a small plastic knotted baggie that appears consistent with packaged narcotics and consistent with the baggies purchased at **Subject Apartment 1** by the UCs. Below is a screenshot of POWELL exiting **Subject Apartment 2** with the baggie:



41.     Minutes later, POWELL re-entered **Subject Apartment 2** with an unidentifiable person wearing a mask. Minutes later, POWELL again exited **Subject Apartment 2.** Approximately two hours later, POWELL returned to **Subject Apartment 2** carrying a dark bag. Over an hour later, surveillance captured SPENCER arriving at **Subject Apartment 2**, receiving a bag from a person who is

24

not visible on camera, and exiting the **Subject Apartment 2** building with the bag.

Below is a screenshot of SPENCER receiving the bag:



Based on my training and experience, although not entirely visible, the wrapped, rectangular item in the bag being handed to SPENCER appears consistent with a wrapped kilogram of drugs, often referred to as a "brick." Minutes later, surveillance cameras then captured SPENCER, who as described above, distributed drugs at **Subject Apartment 1**, bringing the bag into the **Subject Apartment 1** building.

25

42.     About 25 minutes after SPENCER left **Subject Apartment 2** with the bag, POWELL exited **Subject Apartment 2** carrying a white backpack. About an hour after POWELL exited, an unknown female entered the **Subject Apartment 2** building and, while in the entranceway, received a small blue plastic package from a person in **Subject Apartment 2** who is not visible on camera.

*Tyler Evans*
_____
TYLER EVANS
Special Agent
Bureau of Alcohol, Tobacco, Firearms &
Explosives


SWORN TO AND AFFIRMED by telephone February 20, 2026.

*Laura K. McNally*
_____
Honorable LAURA K. MCNALLY
United States Magistrate Judge

26